Christopher S. Marchese (CA 170239 / marchese@fr.com)
FISH & RICHARDSON P.C.
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel: (213) 533-4240 / Fax: (858) 678-5099

Frank E. Scherkenbach (CA 142549 / scherkenbach@fr.com)
Proshanto Mukherji (MA 675801 / mukherji@fr.com)
Elizabeth G.H. Ranks (MA 693679 / ranks@fr.com)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02110
Tel: (617) 542-5070 / Fax: (617) 542-8906

Jonathan J. Lamberson (CA 239107 / lamberson@fr.com)
Betty Chen (CA 290588 / bchen@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel: (650) 839-5070 / Fax: (650) 839-5071

Attorneys for Defendant
ADOBE INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| REALTIME ADAPTIVE STREAMING, LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ADOBE INC.,<br><br>　　　　　Defendant. | Case No. 2:18-cv-09344-GW (JCx)<br><br>**ADOBE'S OPPOSITION TO REALTIME'S MOTION TO STRIKE PORTIONS OF ADOBE'S EXPERT REPORTS ON INVALIDITY AND NONINFRINGEMENT**<br><br>DATE:　January 23, 2020<br>TIME:　8:30 a.m.<br>JUDGE:　Hon. George H. Wu |

# **TABLE OF CONTENTS**

I. ARGUMENT ................................................................................................. 1

    A. Adobe Applied the Fallon Patent's Definition of Asymmetry ............................................................................................ 1

    B. Adobe's Obviousness Contentions are Proper ..................................... 3

        1. The Fallon Patent Contentions are Detailed and Specific .................................................................................... 3

        2. The '777 Patent Contentions are Detailed and Specific .................................................................................... 4

    C. Adobe Clearly Disclosed its Reliance on H.263 ................................. 7

    D. Adobe's Expert Opinions on Third Party Products are Proper ................................................................................................... 9

II. CONCLUSION ........................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
    Case No. 98-CV-2359 .................................................................................................8

*Arctic Cat Inc. v. Bombardier Rec. Prods.*,
    876 F.3d 1350 (Fed. Cir. 2017) .................................................................................10

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
    No. 14-CV-00876-RS (JSC), 2018 U.S. Dist. LEXIS 129258
    (N.D. Cal. Aug. 1, 2018) ..............................................................................................4

*Real Time Data, LLC v. Iancu*,
    912 F.3d 1368 (Fed. Cir. 2019) ...............................................................................3, 4

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ...................................................................................1

*Theranos, Inc. v. Fuisz Pharma LLC*,
    Case No. 5:11-cv-05236-PSG, 2014 U.S. Dist. LEXIS 30887 (Mar. 10, 2014) ...9

**STATUTES**

35 U.S.C. § 103 ................................................................................................................3, 4

## I. ARGUMENT

### A. Adobe Applied the Fallon Patent's Definition of Asymmetry

When a patentee defines a term in a patent's specification, "the definition selected by the patent applicant controls." *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). That is the situation here: the Fallon patents expressly state "[a]n asymmetrical data compression algorithm is referred to herein as one in which the execution time for the compression and decompression routines differ significantly." [D149-4 at 10:12-15.] This is definitional language, and Adobe's expert was correct to rely upon it.

Indeed, Realtime has repeatedly acknowledged the definitional nature of this language in its prior pleadings:

- "The '535 and '477 patents provide an **express definition** of 'asymmetric' compression. As the patents state: 'An asymmetrical data compression algorithm is referred to herein as one in which the execution time for the compression and decompression routines differ significantly.'" [D.I. 86 at 34 (emphasis added).]

- "The patents' specifications **define** an asymmetric data compression algorithm as a compression algorithm 'in which the execution time for the compression and decompression routines differ significantly.' '535 patent at 9:63-66. This is a **precise definition**, and a person of skill in the art would understand with reasonable certainty what is meant by 'asymmetric.'" [D.I. 86 (Zeger Decl.), ¶ 25 (emphasis added).]

Realtime also acknowledged the definitional nature of this portion of the patent in the co-pending *inter partes* review ("IPR") proceedings. [*See, e.g.,* Ex. A (IPR2018-01342 POPR) at 3 ("The patent also recognized that using an asymmetrical algorithm … where an 'asymmetrical' algorithm is defined to be a compression algorithm 'in which the execution time for the compression and

decompression routines differ significantly.'"); Ex. B (IPR2018-01169 POPR) at 3 ("An asymmetric algorithm is one in which the execution time for the compression and decompression routines differ significantly.").]

Indeed, Realtime's own technical expert, Dr. V. Thomas Rhyne, acknowledged in his deposition that the Fallon patents use definitional language with respect to this claim limitation:

> Q. So I guess – I'll start reading about 15 line 9. 'In the following description of preferred embodiments, two categories of compression algorithms are defined – an 'asymmetrical' data compression algorithm and a 'symmetrical'" – "and a 'symmetrical' data compression algorithms." Do you see that?
> A. I do.
> Q. And it says then, "An asymmetrical data compression algorithm is referred to herein as one in which the execution time for the compression and decompression routines differ significantly." Right?
> A. Yes.
> **Q. That's pretty definitional language, would you agree?**
> **A. It is. …**

[D.I. 148-8 at 43:14-44:5.]

Realtime's only basis for its motion is a mistaken belief that the Court's claim construction ruling expressly rejected this definitional language from the specification. That is not correct. The primary dispute between the parties at claim construction was whether the term "asymmetric" was indefinite. The Court concluded based on the then-existing record that it was not, and found "no construction is necessary for these terms on the current record." [D.I. 92 at 19.] While the Court declined to adopt any specific construction, it did not reject the definition in the specification, and indeed the Court noted that definition was "supported by the intrinsic record." [*Id.*] The Court indicated that the focus of the parties should be on "the understanding of the claim term to a person of skill in the art at the time of the invention," but as Adobe's expert explained in his deposition,

one of ordinary skill would recognize that the Fallon patents provide an express definition for the term, and would apply that definition. [*See* D.I. 132-4 at 41:8-19.]

Because Dr. Bhattacharjee correctly applied the patent's definition of "asymmetry," the Court should not strike his opinions.

### B. Adobe's Obviousness Contentions are Proper

#### 1. The Fallon Patent Contentions are Detailed and Specific

Realtime's motion with respect to Adobe's obviousness contentions for the Fallon patents relies on a straw-man argument. Specifically, Realtime focuses on just one paragraph from Adobe's expert report, to the exclusion of all others. Realtime ignores what comes before that paragraph—multiple paragraphs of detailed, limitation-by-limitation analysis of how and where each limitation is found in the prior art. [*See* D.I. 151-1 at Sections XIII[D] & [F], XIV[C] & [E].] That analysis bears not only on anticipation but also on obviousness, and it provides the detail that Realtime argues is missing from Adobe's expert report.

As an initial matter, Realtime appears to take the incorrect position that an obviousness analysis assumes something is "missing" from a prior art. [Mot. at 5 (arguing Adobe's analysis fails to discuss "the differences between the claims and references," and that it does not "identify what limitations are missing or what modifications are needed").] This is incorrect, and indeed Realtime recently lost this very argument at the Federal Circuit. Specifically, after having one of its patents invalidated in an IPR proceeding, Realtime argued that the U.S. Patent & Trademark Office ("PTO") committed legal error by invalidating its patent based upon a single reference under 35 U.S.C. § 103. *See Real Time Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019). Realtime argued that the PTO should have instead based its rejection on anticipation under Section 102, since only a single reference was at issue. *Id*. Realtime further argued that the PTO's analysis was deficient because it did not consider the various requirements of obviousness. *Id*. at

1372-73. The Federal Circuit rejected these arguments, noting that "a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." *Id*. (internal citations omitted). The Federal Circuit also said that since the petition identified the prior art as "disclosing every element of claim 1," that was sufficient for obviousness purposes. *Id*. at 1373.

Here, Adobe's expert demonstrated how each limitation of the prior art was present in each prior art reference. [*See* D.I. 151-1 at Sections XIII[D] & [F], XIV[C] & [E].] Thus Realtime's statement that Adobe's expert does not analyze the "differences" between the claims and the prior art references [Mot. at 5] is incorrect—Adobe's expert opines that there are no such differences. Adobe's expert is also clear at the start of each section that he is relying on both anticipation and obviousness. [*See, e.g.,* D.I. 151-1, ¶¶ 161, 267, 353 & 451.] As in *Iancu*, this was sufficient to disclose Adobe's theories. There was nothing more to disclose, and there was nothing improper about Adobe's expert analysis.

Realtime's reliance on *Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. 14-CV-00876-RS (JSC), 2018 U.S. Dist. LEXIS 129258, at *28-30 (N.D. Cal. Aug. 1, 2018), is misplaced because that case did not strike any expert theories; the district court only struck certain language found in a claim chart appended to the expert's report. *Id*. The accused infringer noted that the substance of its expert's obviousness analysis was found elsewhere, and the district court did not strike those opinions. *See id*. at *30. Here, by contrast, Realtime is attempting to strike the substance of Adobe's obviousness opinions, while effectively ignoring all the actual analysis. Realtime has no support for such a sweeping exclusion remedy.

### 2. The '777 Patent Contentions are Detailed and Specific

Realtime's motion to strike Dr. Delp's obviousness analysis is an extended *non sequitur*. Realtime omits the entirety of Dr. Delp's analysis from its brief and then argues that his opinions are "boilerplate." [Mot. 6.] On the contrary, Dr. Delp

explained exactly *what* disclosures can be combined to disclose each limitation, *how* they would be combined, and *why* they would be combined.  Realtime not only ignores all this, but it even excises key sentences from the paragraphs it does purport to quote (without indicating that it has done so).

Dr. Delp did three things in his report, all of which Realtime omits.  First, in Section X, he analyzed the technical contribution of each reference—there are only six, three of which are primary—and showed in individualized detail how some (not all) of them arise in the same technological context, are based on the same technical standards (*e.g.*, H.264), use the same metrics, address the same problems, and use the same techniques. [Ex. C, ¶¶ 77–82 (Carlsson); ¶¶ 87–92 (Keesman); ¶¶ 96–100 (Henry); ¶¶ 104–108 (Winger); ¶¶ 112–118 (Sullivan); ¶¶ 123–127 (Wen).]

Second, in Section XI, Dr. Delp examined the core technologies of each claim limitation, explaining which references disclosed it, how they did so, and that their implementations were similar, and concluding that each would thus be "relevant to [the] limitation" and "would provide a reason to combine."  [*Id.*, ¶¶ 128–200.]

Third, in Section XII, Dr. Delp walked through the claims for each primary reference, identifying and further explaining each obviousness combination.  For instance, taking the element (hybrid coding) and reference (Carlsson) that Realtime's brief purports to quote (Mot. 6:22–7:3, citing Ex. C, ¶¶ 212–213)), Dr. Delp said that it "would be (i) obvious in light of Carlsson itself; and (ii) obvious in light of any of the other references that describe hybrid coding—Keesman, Winger, Sullivan & Wiegand, and Wen—as discussed in Section XI.A above."  [*Id.*, ¶ 209.]  This is four specific combinations, not "dozens" as Realtime contends. [Mot. at 8.][1]

---

[1] Realtime's assertion [Mot. 7:6–7] that a later statement with the words "and/or" implicates "any possible permutation" of these references is incorrect.  As Dr. Delp says in Paragraph 209 (quoted above), Adobe's position is that any one of these references could individually be combined with Carlsson to disclose this limitation.  The sentence Realtime quotes does not identify combinations but

Dr. Delp next discussed these combinations. [*Id.*, ¶¶ 210–213.] Some had their own sections (*e.g.*, Keesman + Winger), while others were combined into one section for each limitation. In either case, Dr. Delp explained what disclosures would be combined, how, and why. In the example above, Dr. Delp first explained that each of the references to be combined with Carlsson addresses the ***same problem*** as Carlsson in the context of the limitation—"how to manage the tradeoff between distortion and bitrate in video coding"—and uses the ***same solution***—*i.e.*, hybrid coding from the same "video encoding standards, such as H.264." [*Id.*, ¶¶ 212–213.] Next, he incorporated by reference the parts of Sections X and XI that explain why these references' hybrid coding techniques are at least known technical substitutes for those of Carlsson and the '777 patent. [*Id.*] Thus, Dr. Delp concluded these were an "implementation choice that a skilled artisan would know could be carried over from any of these references." [*Id.*, ¶ 213.] These points are not boilerplate but individualized; different analyses are given for other limitations.

Realtime ignores most of this and misleadingly omits the rest. For example, its purported block-quote (Mot. 6:22–7:2) is intensely misleading. It: (1) silently ***deletes*** (without indicating that it has done so) the sentence that lays out the references' common technical approach (video encoding, H.264); (2) replaces Dr. Delp's discussion of the references' common technical problem (managing the tradeoff) with the generic phrase "[technological concept]"; and (3) wholly ignores the detailed analysis in Sections X and XI.A that is incorporated by reference.

Separately, Realtime's motion contains zero argument—or even acknowledgement—of a whole category of obviousness opinions: namely, single-reference obviousness. Realtime does not and cannot argue that this is boilerplate. For each reference, Dr. Delp has explained in element-by-element fashion and in individualized detail why the element would have been obvious over the reference rather explains that a skilled artisan "would have known how to" substitute

1 alone.  In the example discussed above, Dr. Delp has a whole separate section with a
2 detailed explanation of why the reference would be "Obvious[] In Light of Carlsson
3 Alone," (Ex. C, ¶ 210-11), which Realtime does not cite, discuss, or contest.
4 Accordingly, Dr. Delp's single-reference obviousness opinions are unchallenged.

### C. Adobe Clearly Disclosed its Reliance on H.263

Realtime's argument that it had no notice of Adobe's intent to rely upon H.263 in combination with other disclosed prior art references is simply false.  The Court ordered Adobe to disclose narrowed sets of prior art that it intended to rely upon both in February and in September of 2019.  [D.I. 59, 81.]  In both of these disclosure, Adobe identified H.263, along with the other references at issue here.  [*See* Exs. D, E (identifying H.263, among others, as elected prior art for the '477 and '907 patents).]  Further, in Adobe's invalidity contentions for both Pauls and RealNetworks, Adobe expressly stated the claims were invalid both "alone **or in combination with other references**."  [*See* Exs. F-I.]  Realtime thus had notice that Adobe intended to combine the prior art that it disclosed.

Adobe's contentions then disclosed the specific portions of the references that it intended to rely upon and combine.  Specifically, Adobe served a claim chart for H.263 that expressly discussed its support for "Syntax-based Arithmetic Coding," which is the part of the reference Adobe relies upon for obviousness.  [*See* Exs. J at 9, 20, 24 (discussing "Syntax-based Arithmetic Coding"), K at 6 (same).]

Next, in Adobe's disclosures for Pauls, Adobe referred to H.263 on at least 10 occasions.  [*See* Ex. F at 1, 3, 6, 10, 11, 13, 16, & 19; Ex. G (incorporating by reference portions of Exhibit F-3, including those referring to H.263, and also referring to H.263 at p.4.]  While Realtime argues that Adobe's claim chart for Pauls never disclosed H.263 "for any independent claim of the Fallon patents," this is simply false.  Adobe cited H.263 on the very first page of its claim chart for the '477

features between them.  [*See* Ex. C, ¶ 212.]

patent, under independent claim 1, limitation 1[a].  [*See* Ex. F at 1.]  Adobe also discussed H.263 in limitations 1[b] and 1[c].  [*See id*. at 3 & 6.]  For independent claim 20, since the relevant claim language was identical to claim 1, Adobe referred back to the earlier claim limitation (1[a], 1[b], and 1[c]) which, as noted, cite H.263.  [*See id.* at 27 (referring back to Claim [1a]) & 28 (referring back to Claims [1b] and [1c]).]  Finally, for independent claim 1 of the '907 patent, again because the relevant claim language was identical, Adobe referred Realtime to claim 1 of the '477 patent, which again specifically referenced H.263.  [*See* Ex. G at 1 (referencing limitations [1a] & [1b] of the '477 patent) & 2 (referencing limitation [1c] of the '477 patent).]

Finally, in Adobe's claim chart for RealNetworks, Adobe specifically discussed QuickTime.  [*See* Ex. H at 2, I at 1 (referring to the '477 patent claim 1[a]).]  This is relevant because the only use of H.263 in Adobe's invalidity analysis for RealNetworks relates to QuickTime.  Specifically, Adobe's expert described how "the RealSystem G2 Production Guide refers to encoding for QuickTime, which was a video format released by Apple," and "[a]t the time the asserted patents were filed in February of 2001, QuickTime supported the H.263 video encoding standard."  [D.I. 151-1, ¶ 214.]  Had Realtime simply investigated QuickTime, it would have understood that QuickTime used H.263.  Adobe should not be prohibited from discussing this simply because Realtime failed to investigate.

To quote from Realtime's own prior arguments against Adobe's motion to strike, "[t]o the extent [Realtime] believed that [Adobe's] contentions were at all ambiguous or insufficient, it was required to seek clarification." [D.I. 119 at 10, citing *Realtime Data v. Actian*, 15-cv-463, Dkt. No. 510 at 5 (E.D. Tex. Apr. 17, 2017).]  Realtime never sought such clarification here.  Because Adobe's invalidity theories were adequately disclosed, the Court should not strike them.  *See Abbott Labs. v. Syntron Bioresearch, Inc.*, Case No. 98-CV-2359 H (POR), 2001 U.S. Dist.

LEXIS 26339 at *9-13 (S.D. Cal. Aug. 23, 2001) (refusing to exclude prior art references because patent holder was on notice that accused infringer would rely upon them); *Theranos, Inc. v. Fuisz Pharma LLC*, Case No. 5:11-cv-05236-PSG, 2014 U.S. Dist. LEXIS 30887 at *8-9 (Mar. 10, 2014) (same).

Finally, to the extent the Court concludes there was any lack of disclosure, there is no prejudice. Realtime's only argument on prejudice is a single sentence that it "relied on Adobe's invalidity theories…in making its final election of asserted claims." [Mot. at 9.] Realtime does not explain how its choices would have been different had it known Adobe's theories, and Realtime has not sought leave to alter the asserted claims after reviewing Adobe's expert report. In opposing Adobe's motion to strike, Realtime previously argued to this Court that "[e]xclusion of expert opinion is unwarranted where … any potential prejudice can be cured by, e.g., allowing full opportunity to respond to the expert opinion or to depose the expert." [D.I. 119 at 4, citing *Automotive Data Sol'n, Inc. v. Directed Electronics Canada, Inc.*, No. CV 18-1560-GW(Ex), Dkt. No. 300 ("Automotive Data") (C.D. Cal. Sept. 16, 2019).] Here, Realtime had such an opportunity to respond in its invalidity rebuttal report, and to depose Adobe's expert. Moreover, in denying Adobe's motion to strike, the Court held that even where Realtime did not disclose theories, since Realtime's theory was "substantially the same for each encoding standard," it should not be struck. [D.I. 126 at 2.] Here, Realtime acknowledges that Adobe disclosed H.263 in combination with the Voois reference, and Adobe's use of H.263 for Pauls and RealNetworks is identical to its theories with respect to Voois. [*See* D.I. 151-1, Sections XVI[B] & [C].] Because Adobe's theories were properly disclosed, and because there is no prejudice, Realtime's motion should be denied.

### D. Adobe's Expert Opinions on Third Party Products are Proper

Realtime misstates the law in its arguments on marking. It is not Adobe's burden to show that Realtime licensee's products embody the asserted patents;

rather, under *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1368-69 (Fed. Cir. 2017), Adobe need only identify potential embodying products, and the burden then shifts to Realtime to prove that those products do not embody. Adobe met that burden by having its technical experts review Realtime's infringement contentions and opine as to whether products sold by licensees included the same features Realtime accused of infringing. Realtime's 30(b)(6) witness on marking stated that Realtime's infringement contentions were sufficient to show that a product practices the asserted claims. [*See* Ex. L (McErlain Dep.) at 207:1-6.] There was nothing improper about Adobe's experts relying on Realtime's own infringement contentions to show how licensed products include the same accused features in order to shift the burden to Realtime to show it complied with the statute.

      Realtime also argues that Adobe's expert opinions should be excluded because they are "based on no technical analysis and are untethered to claim language, element-by-element analysis, or even the Court's constructions." [Mot. at 10.] This is incorrect. Realtime argued to this Court that its contentions provide various "examples" of functionalities that practice its claims. [*See, e.g.*, D.I. 119 at 16-18.] Adobe's experts applied their technical understanding to identify which examples were relevant, and to show how and where those functionalities are in each licensed product. Adobe's experts did an "element-by-element" analysis (each limitation is covered), and necessarily apply the Court's claim constructions because they relied upon Realtime's own contentions, which applied those constructions. The only way Adobe's analysis could be deficient is if Realtime acknowledges its infringement contentions are deficient. Since Realtime makes no such argument, its motion must be denied.

## II.   CONCLUSION

      For the foregoing reasons, the Court should deny Realtime's motion.

| | | |
|---|---|---|
| 1 | Dated: December 17, 2019 | FISH & RICHARDSON P.C. |
| 2 | | |
| 3 | | By: */s/ Jonathan J. Lamberson* |
| | | Jonathan J. Lamberson |
| 4 | | |
| 5 | | Attorneys for Defendant |
| | | ADOBE INC. |

51124189.doc